# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DANIEL PETER SAIZ,

      Plaintiff,

v.                                         No. CIV-15-0305 LAM

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*** (*Doc. 18*), filed January 18, 2016 (hereinafter "motion"). On April 20, 2016, Defendant filed a response (*Doc. 23*) to Plaintiff's motion and, on May 4, 2016, Plaintiff filed a reply (*Doc. 24*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Docs.* 4 and 8]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 13*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

# I.   Procedural History

On January 11, 2011 (*Doc. 13-10* at 11), Plaintiff protectively filed an application for Disability Insurance Benefits (hereinafter "DIB"), alleging that he was disabled due to "heart problems, lower back problems, [and] depression" (*id.* at 23), with a disability onset date of October 20, 2009 (*id.* at 11).   Plaintiff's' last day of insurance for DIB purposes, was December 31, 2014.   [*Doc. 13-6* at 5].   Plaintiff's application was denied at the initial level on June 2, 2011 (*id.* at 2), and at the reconsideration level on August 19, 2011 (*id.* at 4).   On August 31, 2011, Plaintiff requested a hearing to review the denial of his application.   [*Doc. 13-7* at 10-11].   Administrative Law Judge Frederick Upshall Jr. (hereinafter "ALJ") conducted a hearing on September 21, 2012.   [*Doc. 13-5* at 2-30].   At the hearing, Plaintiff was present, represented by non-attorney representative Peter Shams-Avari, and testified.   *Id.* at 4, 6-20. Plaintiff's wife, Elizabeth Saiz (*id.* at 21-25), and Vocational Expert (hereinafter "VE"), Clarence Hewlett (*id.* at 25-28), also testified.   After the hearing, the ALJ requested that Plaintiff be examined by an acceptable medical source "to obtain additional information about the existence and severity of [Plaintiff]'s physical impairments."   [*Doc. 13-4* at 5-6].   As a result, Plaintiff was examined by Jon Brown, D.O., on April 6, 2013, and Dr. Brown's report became part of the record upon which the ALJ based his decision.   [*Doc. 13-19* at 37-43].

On September 3, 2013, the ALJ issued his decision (*Doc. 13-4* at 5-27) finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled from his alleged onset date of October 20, 2009 through the date of the decision (*id.* at 27).   Plaintiff, through his current attorney, requested that the Appeals Council review the ALJ's decision.   [*Doc. 13-3* at 37].   On February 14, 2014, Plaintiff's attorney submitted additional evidence to the Appeals Council, consisting of assessments of Plaintiff's mental impairments based on an examination of him by

Emily Driver Moore, Ph.D. on January 17, 2014.   *Id.* at 8-24.   On February 24, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id.* at 2.   In its denial, the Appeals Council stated that it had "looked at" Dr. Moore's February 2014 reports, but indicated that this evidence "does not affect the decision about whether [Plaintiff was] disabled beginning on or before September 3, 2013 [the date of the ALJ's decision]," because "[t]his new information is about a later time."   *Id.* at 2-3.   That was the extent of the Appeals Council's discussion of Dr. Moore's evaluation.   This decision was the final decision of the Commissioner.   On April 16, 2015, Plaintiff filed his complaint in this case.   [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d

at 760 (citation and quotation marks omitted).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).  While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III.   Applicable Law and Sequential Evaluation Process

For purposes of DIB, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively

disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on February 18, 1967, and was 42 years old on October 20, 2009, the alleged onset date of his disability.   [*Doc. 13-9* at 2].   Thus, for the purposes of his disability claim, Plaintiff is considered to be a "younger person."[1]   Plaintiff stated that the highest level of school he had completed was ninth grade, and that he had also completed job training in welding through the Albuquerque Job Corps in 1986.   [*Doc. 13-10* at 24].   Plaintiff related that he was in special education classes throughout his school years, then attended tenth grade for "one week" before being "sent [] back to middle school, or 9th grade."   [*Doc. 13-3* at 11].   After he was subsequently returned to tenth grade, he states that he "missed so much school I just never went back."   *Id.*   He states that he attended Job Corps, and later earned his General Educational Development certificate.   *Id.*   He can read and understand English.   *Id.*   For approximately nine years prior to his alleged disability onset date, and for approximately seven months thereafter, Plaintiff worked for Wal-Mart as an "order filler."   *Id.*   Prior to that, in the mid-to-late-1990s,

---

[1]   *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

Plaintiff held jobs in apartment maintenance and in construction, in which he worked as both an electrician and as a "painter-molder." [*Doc. 13-10* at 24]. As an "order filler" at Wal-Mart, Plaintiff used a forklift to retrieve items from a warehouse, and also moved product himself, frequently lifting 40-60 pounds and also sometimes lifting as much as 80 pounds. *Id*. at 41.

Plaintiff's medical records include: rehabilitation records from Barrie W. Ross, M.D. for the period from April 7, 2010 to November 1, 2010 (*Doc. 13-12* at 6-24); treatment records from the University of New Mexico Health Sciences Center for the period from October 4, 2010 to July 6, 2011 (*Doc. 13-13* at 2-24; *Doc. 13-14* at 2-12; *Doc. 13-15* at 2-8; *Doc. 13-16* at 2-6; *Doc. 13-17* at 2-37; *Doc. 13-18* at 27-36); treatment records from Joseph Aragon, M.D. for the period August 3, 2010 to June 9, 2011 (*Doc. 13-18* at 22-26; *Doc. 13-19* at 9-34); a physician's statement from Joseph Aragon, M.D dated September 14, 2012 (*Doc. 13-19* at 35); treatment records from Carlos Esparza, M.D. for the period January 10, 2012 to August 13, 2012 (*id*. at 2-8); physical RFC assessment by Allen Gelinas, M.D. dated March 30, 2011 (*Doc. 13-17* at 40-47); psychiatric review technique by Paul Cherry, Ph.D. dated June 1, 2011 (*Doc. 13-18* at 8-20); consultative examination report by Rod J. Merta, Ph.D. dated April 25, 2011 (*id*. at 2-7); consultative examination report by Jon Brown, D.O. dated April 6, 2013 (*Doc. 13-19* at 37-43); and consultative psychological evaluation by Emily Driver Moore dated February 1, 2014 (*Doc. 13-3* at 9-24). Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process, the ALJ found that Plaintiff had engaged in substantial gainful activity between October 2009 and May 2010, but that there had been a continuous 12-month period during which he did not engage in substantial gainful activity after May 5, 2010. [*Doc. 13-4* at 7-8]. At step two, the ALJ found that Plaintiff "has the following

severe impairments:  Coronary artery disease with stent placement; degenerative disc disease; and, status post[-]myocardial infarction vs. transient ischemic attacks."[2]  *Id.* at 8.  The ALJ also found that Plaintiff's "medically determinable mental impairment of affective disorder does not cause more than minimal limitation in [his] ability to perform basic mental work activities and is therefore non[-]severe."  *Id.*  At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. Part 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  *Id.* at 10.  In so concluding, the ALJ considered Listing 1.04 Disorders of the Spine, and Listing 4.04 C Coronary Artery Disease.  *Id.* at 10-11.  Before step four, the ALJ found that Plaintiff had the RFC "to perform the full range of light work as defined in 20 CFR 404.1567(b)."[3]  *Id.* at 12.  In support of this RFC assessment, the ALJ found that

---

[2] Defendant suggests that the statement "status post[-]myocardial infarction vs. transient ischemic attacks" indicates that the ALJ considered Plaintiff's severe impairments to include status post-transient ischemic attacks ("TIA").  *See* [*Doc. 23* at 15].  The Court does not agree.  When this clause from the ALJ's statement of Plaintiff's severe impairments is considered in the context of the ALJ's decision as a whole, the use of "vs." appears to indicate that the ALJ considered Plaintiff's severe impairment to be status post-myocardial infarction, *as opposed to,* post-TIA.  *See, e.g.,* [*Doc. 13-4* at 14, 21, 25].  In any event, whatever the ALJ meant to convey through the inclusion of this language, he did not do so clearly, and it appears to this Court that the clause "vs. [TIA]" would have been better left to the ALJ's explanation of Plaintiff's severe impairments, rather than included in the defining statement of impairments itself.

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567.  Light work is an "exertional" classification that involves "the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling."  20 C.F.R. § 404.1569a(a).  "Nonexertional limitations," on the other hand, relate only to the "ability to meet the demands of jobs other than the strength demands," and include difficulties with "maintaining attention or concentrating" or "understanding or remembering detailed instructions," among other things.  20 C.F.R. § 404.1569a(c).  However, the ALJ's finding that Plaintiff can perform the "full range" of light work is a finding that Plaintiff is "able to perform substantially all of the exertional *and nonexertional* functions required in work at that level."  Soc. Sec. Rep. 96-8P,

Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id*. at 22.

At step four, the ALJ found that Plaintiff "was unable to perform any past relevant work." *Id*. at 26.   At step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform.   *Id*. at 27.   In support of this finding, the ALJ did not rely on the VE's testimony, instead stating that "[b]ased on a [RFC] for the full range of light work, considering [Plaintiff]'s age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.18."  *Id*.   Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act "from October 20, 2009, through the date of this decision."   *Id*.

## V.   Analysis

Plaintiff is now 49 years old, and was first injured in a workplace accident approximately 14 years ago, in 2002.  *See* [*Doc. 13-12* at 19].   At that time, Plaintiff suffered a back injury while operating a forklift at his job with Wal-Mart.   *Id*.   Plaintiff continued working and received physical therapy.   *Id*.   He reinjured his back more than once thereafter, and at some point, was switched from his job as an "order filler" to "light duty."   *See* [*Doc. 13-5* at 11-12] and [*Doc. 13-12* at 19].   Plaintiff continued to work until May 5, 2010, at which time Wal-Mart placed him on leave under the Family Medical Leave Act.   [*Doc. 13-9* at 19-21].   However,

_____

1996 WL 374184, at *3 (July 2, 1996) (emphasis added).   Thus, the RFC assigned to Plaintiff does not include any mental, manipulative, or environmental limitations.

Plaintiff's employment by Wal-Mart was fully terminated on August 19, 2010 for the stated reason of "[f]ailure to [r]eturn from [leave of absence]."   *Id*. at 18.

The earliest medical records the Court has that relate to Plaintiff's back injury are from Barrie W. Ross, M.D., dated April 7, 2010.   [*Doc. 13-12* at 19-24].   From at least that date, Plaintiff has consistently complained to health care providers of chronic back pain.   *See, e.g.,* [*Doc. 13-18* at 22-23] (Dr. Aragon); *id.* at 28 (Dr. Noonan); [*Doc. 13-19* at 2] (Dr. Esparza); *id.* at 37 (Dr. Brown).   In October 2010, Plaintiff also suffered a myocardial infarction,[4] for which he was hospitalized.   [*Doc. 13-13* at 2-6, 14].   A drug-eluting stent[5] was surgically placed in Plaintiff's right coronary artery on October 5, 2010.   [*Doc. 13-14* at 4].   In January 2011, Plaintiff was again treated in the University of New Mexico's Emergency Department for chest pain.   [*Doc. 13-13* at 3, 7-13].   During this hospital examination, Plaintiff's wife reported that Plaintiff had been having "episodes of slurring of speech, and left upper extremity numbness." *Id.* at 7.   As a result of his symptoms, Plaintiff was evaluated for possible transient ischemic attack ("TIA")[6] during this hospital visit.   *Id.* at 7-8.   At this time, Plaintiff protectively filed his

---

[4] Myocardial infarction is the medical term for a heart attack.   http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0021982/ (site last visited August 16, 2016).

[5] A "stent" is a small metal mesh tube inserted into an artery to keep it open.   A "drug-eluting stent" is coated with medication that is slowly released, or "eluted," to help the artery remain smooth and open, thereby ensuring good blood flow through it.   http://www.mayoclinic.org/diseases-conditions/coronary-artery-disease/in-depth/drug-eluting-stents/art-20044911 (site last visited August 16, 2016).

[6] TIAs, also known as mini-strokes, cause blood flow to part of the brain to stop briefly and can mimic stroke-like symptoms.   These symptoms typically disappear within less than 24 hours and, although "TIAs generally do not cause permanent brain damage, they are a serious warning sign that a stroke may happen in the future and should not be ignored."   http://www.stroke.org/understand-stroke/what-stroke/what-tia (site last visited August 16, 2016).   "TIA is caused by a clot; the only difference between a stroke and TIA is that with TIA the blockage is transient (temporary).   TIA symptoms occur rapidly and last a relatively short time.   Most TIAs last less than five minutes; the average is about a minute.   When a TIA is over, it usually causes no permanent injury to the brain."

claim for DIB based on heart problems, back problems, and depression.   During 2011 and 2012, Plaintiff continued to report chronic pain and depression.   *See, e.g.,* [*Doc. 13-18* at 2; 20; *Doc. 13-19* at 9, 16, 27].   At the hearing before the ALJ in September 2012, Plaintiff described his past work, identified his "condition" as having had "two strokes, one stent put in my heart and my back injury" (*Doc. 13-5* at 14), detailed the difficulty he had walking, sitting, and lifting (*id.* at 14-18), and stated that "the pain is, is just really, really bad" (*id.* at 14).   Plaintiff also testified that, while in school, he had been in special education classes because he was "slow," and that he can read and write, but cannot do basic addition and subtraction.   *Id.* at 7.   Plaintiff's wife testified regarding Plaintiff's memory problems, panic attacks, and depression.   *Id.* at 21-24.   At the conclusion of the hearing, the ALJ indicated that he intended to order a physical consultative examination of Plaintiff, which he indicated was needed because the worker's compensation doctors had "released [Plaintiff] on either light or medium [work] at various times with respect to the back condition."   *Id.* at 28.   At the ALJ's request, a consultative physical examination of Plaintiff was performed by Jon Brown, D.O. in April 2013 (*Doc. 13-19* at 37-43), approximately six months after the hearing, and the ALJ's decision denying benefits was issued on September 3, 2013.   At the request of Plaintiff's counsel, Plaintiff was evaluated by Dr. Moore on January 17, 2014.   Her report regarding Plaintiff's mental limitations was submitted to the Appeals Council on February 14, 2014 (*Doc. 13-3* at 8-24), and was rejected by the Council in its decision of February 24, 2015, one year later (*id.* at 2-5).

Plaintiff argues in his motion to reverse or remand that: (1) the Appeals Council erred by dismissing Dr. Moore's 2013 medical evidence on the ground it was not chronologically

---

http://www.strokeassociation.org/STROKEORG/AboutStroke/TypesofStroke/TIA/TIA-Transient-Ischemic-Attack_UCM_310942_Article.jsp#.V4_Ph0cViJA (site last visited August 16, 2016).

pertinent (*Doc. 18* at 13-16); (2) the ALJ erred by rejecting the consulting opinion of Dr. Brown and failing to properly develop the medical record (*id*. at 16-22); and (3) the ALJ failed to properly weigh the opinions of treating physicians Huisa-Garate, Noonan, and Aragon (*id*. at 22-26).   In response, Defendant asserts that (1) Dr. Moore's consultative examination results were properly rejected by the Appeals Council because they did not relate to the relevant time period (*Doc. 23* at 10-11); (2) the ALJ gave reasonable explanations for giving little weight to Dr. Brown's opinion (*id*. at 12-14); and (3) the ALJ reasonably weighed the treating physician medical opinions (*id*. at 14-17).   In his reply, Plaintiff reiterates his previous claims.   [*Doc. 24*].

## A.   Appeals Council's Rejection of New Evidence

Plaintiff requested Appeals Council review of the ALJ's September 2013 decision and, on February 14, 2014, Plaintiff's counsel submitted a package of documents to the Appeals Council to be included in the record and considered by it as part of Plaintiff's appeal.   *See* [*Doc. 13-3* at 8-24].   The documents submitted consisted of a psychological evaluation/report (*id*. at 9-18),[7] an assessment of ability to perform mental work-related activities (*id*. at 19-20), an assessment of "adaption to temperament characteristics" in job scenarios (*id*. at 21), and listing criteria assessments for Listings 12.02 Organic Mental Disorders (*id*. at 22), 12.04 Affective Disorders (*id*. at 23), and 12.08 Personality Disorders (*id*. at 24), all of which were performed and provided by Emily Driver Moore, Ph.D.   Dr. Moore evaluated Plaintiff on January 17, 2014, at the request of Plaintiff's attorney, and signed the submitted documents on February 2, 2014.

---

[7] The Court notes that page 10 of this document (which should have been at *Doc. 13-3* at 18), was not included in the pages that were faxed by Plaintiff's counsel to the Appeals Council.   Although this appears to be an inadvertent omission, it will need to be rectified on remand, so that everyone who may be involved in the reconsideration of Plaintiff's claim will have the benefit of Dr. Moore's *entire* report.

In sum, Dr. Moore's evaluations were based on her clinical interview of both Plaintiff and his wife, and a mental status examination, in which she used various widely-used tests. Dr. Moore also reviewed the following records: (1) the consultative psychological examination by Rod Merta, Ph.D on April 25, 2011; (2) treatment records from the University of New Mexico Health Sciences Center, for the period from October 4, 2010 through July 6, 2011; and (3) treatment records from Carlos Esparza, M.D., for the period January 10, 2012 through August 13, 2012.  [*Doc. 13-3* at 9].   In her clinical interview, Dr. Moore sought information about Plaintiff's histories in the areas of family, marital relationship, education, employment, legal, medical, mental health, and activities of daily living.  *Id*. at 9-15.   In the mental status exam, Dr. Moore noted, among numerous other observations, that:

- Plaintiff's "reliability as an informant appeared to be poor, due to pronounced impairments in memory, thinking, and speech."  *Id*. 9.

- His "orientation to time was demonstrably impaired and variable through the interview.   He was oriented to place and purpose."  *Id*. at 15.

- Plaintiff had not taken his usual pain medication prior to the appointment because he did not want to be too sleepy to complete the testing.   However, he did take an anxiolytic[8] at the beginning of the interview in order to calm himself.  *Id*.

- His "use of language was compromised by difficulties with word finding, memory and focus."  *Id*.

- Plaintiff's "[a]ttention, concentration and memory were impaired. Thought processes were at times logical and coherent, but often were confused and discontinuous."  *Id*.

---

[8]   An "anxiolytic is "a drug that relieves anxiety."  http://www.merriam-webster.com/dictionary/anxiolytic (site last visited August 16, 2016).

- His "historical narrative was frequently disjointed and, according to Mrs. Saiz, confabulated. Attempts to clarify his account of these events seemed only to cause more confusion and were therefore discontinued." *Id* at 15-16.

- Plaintiff "was frequently unable to hold two thoughts in his mind long enough to compare them." *Id*. at 16.

- He scored 13 (including one added point based on not having completed grade 12) out of a possible 30 on the Montreal Cognitive Assessment ("MoCA").[9] *Id*.

- Plaintiff received a full-scale IQ score of 57 on the Wechsler Adult Intelligence Scales – Fourth Edition, and his scores on that test's various subparts "demonstrate extreme impairment in cognitive functioning in all domains measured . . . falling in the range of mild intellectual disability. His verbal comprehension and processing speed shows the most significant deficits, suggesting that his ability to reason verbally is significantly impaired, as is his ability to learn and apply new information." *Id*.

- Plaintiff "was unable to comprehend items on the [Beck Depression Inventory] sufficiently to allow him to complete the test in any form." Dr. Moore unsuccessfully tried presenting the test in other formats (*e.g.,* oral with read-along, and interview) to allow Plaintiff to understand and complete the test before "[a]ssessment for mood disorders was discontinued," along with Dr. Moore's plans to use three other mood assessment instruments. *Id*. at 17.

Dr. Moore assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 35.[10]

Regarding Plaintiff's cognitive impairments, Dr. Moore stated:

---

[9] MoCA "was designed as a rapid screening instrument for mild cognitive dysfunction. It assesses different cognitive domains: attention and concentration, executive functions, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation. Time to administer the MoCA is approximately 10 minutes. The total possible score is 30 points; a score of 26 or above is considered normal." http://echo.unm.edu/wp-content/uploads/2014/07/clinic-dementia-MoCA-Instructions-English.pdf (site last visited August 16, 2016).

[10] The GAF score is a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, and should not include impairment in functioning due to physical or environmental limitations. DSM-IV-TR at 32. A GAF score of 31-40 indicates "[s]ome impairment in reality testing or

> The history offered by [Plaintiff] and his wife is strongly suggestive of traumatic brain injury (TBI), and a neuropsychological evaluation is recommended to rule out the possibility of post-concussion syndrome.   Although [Plaintiff's] account of his multiple concussions may be questionable due to his apparent confabulation in offering a great deal of negative history that his wife disputed, the fact that Mrs. Saiz offered corroboration through his mother suggests that TBI should be ruled out in this history.   In addition to the reports of physical assault as one source of repeated head injury, the reported history of learning difficulties, domestic violence, and 30 years of heavy alcohol abuse could reveal other sources of head trauma.

*Id*. at 18.   In her assessment of Plaintiff's work-related mental functioning, Dr. Moore indicated that Plaintiff had "marked" limitations in thirteen out of twenty categories, "moderate" limitations in four, and "slight" limitations in three.   *Id*. at 19-20.   With respect to his ability to adapt to different temperament characteristics required by jobs, Dr. Moore indicated that Plaintiff "should avoid" eight out of ten of the given scenarios.   *Id*. at 21.   Finally, Dr. Moore indicated that Plaintiff met the criteria for Listing 12.02 Organic Mental Disorders and Listing 12.04 Affective Disorders (depressive syndrome), but did not meet the criteria for Listing 12.08 Personality Disorders.   *Id*. at 22-24.

Under the Administration's own regulations, "[i]f new and material evidence is submitted [to the Appeals Council], the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision."   20 C.F.R. § 404.970(b). Thus, in order to be considered by the Appeals Council, newly submitted evidence must be "new, material, and chronologically pertinent."   *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).   In this case, the Appeals Council did not consider the evidence, asserting that it was not chronologically relevant.   *See* [*Doc. 13-3* at 2-3].   This is a legal determination, which is

---

communication (e.g., speech is at times illogical, obscure, or irrelevant) *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work)."   *Id*.

reviewable by this Court *de novo*.  *See Threet*, 353 F.3d at 1191.  "Evidence is new within the meaning of [§] 404.970(b) if it is not duplicative or cumulative."  *Id*. (quoting *Wilkins v. Sec'y of Health & Human Servs*., 953 F.2d 93, 96 (4th Cir. 1991)) (internal punctuation omitted). Although Defendant does not appear to contend that Dr. Moore's 2014 evaluation is not "new," the Court concludes that it is neither duplicative nor cumulative of evidence presented at the hearing and is, therefore, "new" within the meaning of the regulation.

Evidence is material "if there is a reasonable possibility that it would have changed the outcome."  *Id*. (quoting *Wilkins*, 953 F.2d at 96) (internal punctuation omitted).  Although the Appeals Council did not rely on immateriality in its rejection of Dr. Moore's report, Defendant appears to imply as much.  *See* [*Doc. 23* at 11] (questioning the "accuracy" of Dr. Moore's examination).  The Court disagrees, and concludes that Dr. Moore's opinions satisfy the materiality standard because, among other things, the ALJ's decision was based in large part on his assessment of Plaintiff's credibility, which Dr. Moore specifically addressed, concluding that Plaintiff was, at least as of the time of her examination, "too impaired" to be manipulative. [*Doc. 13-3* at 18].  With the additional evaluations provided by Dr. Moore, it is "reasonably possible" that the ALJ's findings regarding Plaintiff's credibility would have been different.   It is also reasonably possible that the ALJ would have concluded that Plaintiff's mental impairments render him unable to perform basic work functions (as did Dr. Moore), and that he is thereby disabled.  Although Dr. Moore is a consulting examiner, and her opinion would typically be entitled to less weight than that of a treating physician, it appears that the ALJ did not give "controlling weight" to any of Plaintiff's treating physicians.  *See* [*Doc. 13-4* at 23-26].  In any event, Dr. Moore is an "acceptable medical source," pursuant to 20 C.F.R. § 404.1513(a)(2), and her opinions as an examining expert are entitled to more weight than those of non-examining

experts, such as Disability Determination Services doctors, Allen Gelinas, M.D. (*Doc. 13-6* at 2-3), Scott R. Walker, M.D (*id*. at 9-10), and Paul Cherry, Ph.D.( *Doc. 13-18* at 8-13). *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (examining physician opinions are generally entitled to less weight than those of treating physicians but more weight than those of non-examining physicians). Additionally, it appears that no one, including Plaintiff's non-attorney representative and the ALJ, actually considered that, in addition to his other impairments, Plaintiff may be intellectually compromised. Thus, Dr. Merta, the only other examining psychologist, focused his evaluation almost entirely on whether or not Plaintiff suffered real physical pain, or was simply "malingering." [*Doc. 13-18* at 2-7]. Yet, even Dr. Merta indicated that Plaintiff's "ability to concentrate, pace himself, and persist in the completion of various physical and cognitive tasks is unquestionably impaired," though Dr. Merta attributed this impairment to Plaintiff's "physical limitations." *Id*. at 7.

Dr. Moore provided both objective and subjective assessments, and her evaluation relates to and augments Plaintiff's wife's statements regarding his inability to remember, comprehend, and follow instructions. *See* [*Doc. 13-5* at 21-22]; [*Doc. 13-10* at 35]; and [*Doc. 13-11* at 5-7]. Even more significantly, it augments the indications of several other medical sources that Plaintiff suffered from: depression (*Doc. 13-18* at 4, Dr. Merta noting that Plaintiff is experiencing some degree of depression, and *Doc. 13-19* at 9, 27, Dr. Aragon noting that Plaintiff complained of depression); anxiety/panic attacks (*id*. at 31, Dr. Huisa-Garate noting probable panic attacks); difficulty with language (*id*. at 42, Dr. Brown noting "difficulties with speech as well as understanding language"); confusion (*id*. at 5, Joel D. Gelinas, PA-C noting "somewhat confused"); memory (*Doc. 13-13* at 4, Charles H. Washington III, M.D. noting that Plaintiff is "not sure who his primary care provider is" and "had a difficult time quantifying" his prior alcohol

intake, and *Doc. 13-18* at 5, Dr. Merta noting deficits in recent memory); and concentration (*id.* at 7, Dr. Merta noting that Plaintiff's concentration, pace, and persistence are "unquestionably impaired," and *Doc. 13-19* at 40, Dr. Brown noting that Plaintiff's "concentration was not good"). Dr. Moore's evaluation also relates to the opinions from medical sources that Plaintiff seemed to give good effort in the evaluations.   *See id.* at 7-8 (Dr. Esparza noting that Plaintiff seemed motivated), and at 42 (Dr. Brown noting that Plaintiff gave his best effort).   There can be little doubt that it is "reasonably possible" that Dr. Moore's opinions would have changed the outcome of the ALJ's decision.   The new evidence is, therefore, material.

The stated reason for the Appeals Council's rejection of Dr. Moore's evaluation was that it was "about a later time."   [*Doc. 13-3* at 2].   Defendant asserts that this was not error, stating:

> Contrary to Plaintiff's argument, the Appeals Council reasonably determined that Dr. Moore's report and opinions were not chronologically relevant to the ALJ's decision, which addressed a period of time through September 3, 2013. Significantly, Dr. Moore did not conduct her psychological examination until more than four months after the date of the ALJ's decision and had no prior treating or examining relationship with Plaintiff during the relevant time period.   As such, Dr. Moore's report and opinions pertained to Plaintiff's mental condition after the relevant time period at issue in the ALJ's decision.

*Doc. 23* at 10.   However, 20 C.F.R. § 404.970(b) does not require that the submitted "new and material evidence" be created prior to the ALJ's decision; only that it "relate to" that period. Thus, in *Padilla v. Colvin*, 525 F. App'x 710, 712 (10th Cir. 2013) (unpublished), the Tenth Circuit reversed an Appeals Council decision that rejected additional evidence, including a psychological evaluation that "took place after the ALJ's final decision," on the basis that the "new information is about a later time."   Noting that "temporal relevance" was "one of the predicate requirements" of § 404.970(b), the *Padilla* court considered the issue *de novo*.   *Id*.   The psychological report stated that the claimant had "major depressive disorder, anxiety, and a few different learning impairments," and the court noted that claimant's "low intellectual function

suggests he could be presumptively disabled under [Listing] 12.05, because he had a full-scale IQ score of 67."[11]   *Id.* at 713.   The *Padilla* court then determined that the new information was "temporally relevant," stating:

> [T]he psychological report corroborates an anxiety diagnosis reported by Mr. Padilla's treating doctor, Dr. Evans, prior to the hearing, as well as Mr. Padilla's hearing testimony.   Meanwhile, his intellectual functioning evaluation relates to and augments Dr. Evans' earlier report that he could not read or write. . . .   The additional evidence thus relates to the time period before the ALJ's decision.   As such, the Appeals Council should have considered the additional evidence in order to properly determine whether the ALJ's decision was supported by substantial evidence.

*Id.*

In this case, both Dr. Merta and Dr. Brown attributed Plaintiff's perceived mental impairments to his physical condition, but only Dr. Moore provided objective psychological evidence of mental impairments that could be disabling on their own.   With respect to those impairments, Dr. Moore was also the only one who considered that they may even have preceded his work-related injuries.   In particular, Dr. Moore opined that Plaintiff's childhood head injuries may have led to traumatic brain injury and, therefore, cognitive deficits.   [*Doc. 13-3* at 18]. Whether or not one accepts this hypothesis, it cannot be said that the mental deficits Dr. Moore diagnosed do not "relate to" the time period from Plaintiff's physical injury to the issuance of the ALJ's decision.

Defendant also asserts that Dr. Moore's evaluation lacks temporal relevance because she "explicitly acknowledged the temporal limitations of her post-decision examination when she

---

[11] This IQ score is 10 points higher than the one Plaintiff was assessed with in this case.   However, it does not appear that Dr. Moore evaluated Plaintiff under the Listing 12.05 Intellectual Disability criteria, instead considering Plaintiff's intellectual impairment to be an organic mental disorder under Listing 12.02.

noted that, 'it is certainly possible that [Plaintiff] was less compromised in 2011 than he appears at present.'" [*Doc. 23* at 11].  This statement by Dr. Moore is specifically directed at Dr. Merta's suggestion that Plaintiff may have been "malingering" (*Doc. 13-3* at 18), and is the only statement in Dr. Moore's lengthy report that could possibly be characterized as having a "temporal limitation."   When the statement is considered in context, however, it is clear that Dr. Moore was suggesting that Dr. Merta's skepticism was unfounded, as she immediately thereafter opined that "[a] claimant with a motivation to present poorly for secondary gain would be unlikely to choose this particularly difficult presentation as his 'act,' nor would his false 'impairments' feel convincing to an experienced evaluator."   *Id*.   In any event, it is significant that, while Dr. Moore's evaluation took place approximately four and one-half months after the relevant disability determination of September 3, 2013, Dr. Merta's evaluation was performed approximately two years and three months prior to that date.   Thus, although Dr. Moore may have hesitated to speculate regarding Plaintiff's mental abilities in 2011, it seems unlikely that she would limit her opinion to something less than the five-month period preceding her examination. In addition, Dr. Moore's evaluation of Plaintiff was still performed prior to the last day of Plaintiff's disability insurance coverage, which is the date by which he must establish onset of a disability in order to be eligible for benefits.[12]

---

[12] The record supports a date last insured for Plaintiff of December 31, 2014 (*Doc. 13-10* at 56; *Doc. 13-11* at 10), while the ALJ reported that date as December 31, 2015 in his decision (*Doc. 13-4* at 5).   Either way, however, Dr. Moore's evaluation took place within the period of time required for Plaintiff to qualify for disability insurance benefits.

Defendant also contends that "[t]he accuracy of Dr. Moore's post-decision examination was further undermined by the fact that she acknowledged that Plaintiff's 'reliability as an informant appeared to be poor' and that Plaintiff's wife admitted[13] that Plaintiff's 'confabulation of historical events is quite typical of her husband.'"[14]   [*Doc. 23* at 11].   Contrary to Defendant's implication, the word "confabulation," particularly in this context, does not mean "fabrication." In a psychiatric context, the term "confabulation" means "the replacement of a gap in a person's memory by a falsification *that he or she believes to be true*." http://www.dictionary.com/browse/confabulation (site last visited August 16, 2016) (emphasis added).   Thus, the statement upon which Defendant relies as support for inaccuracy of Dr. Moore's report actually shows that, not only did she recognize that Plaintiff's historical accounts might not be accurate, she understood that the inaccuracy of Plaintiff's statements were the result of his memory issues and that, rather than being intentionally deceptive, Plaintiff was not even aware that his historical accounts were incorrect.

The Court finds that Dr. Moore's evaluation of Plaintiff satisfies all three criteria for consideration of additional evidence at the Appeals Council level of review because it is "new, material, and chronologically pertinent."   *Threet*, 353 F.3d at 1191.   Therefore, the rejection of that evidence "means that the Appeals Council did not evaluate the entire record including the new

---

[13] The word actually used by Dr. Moore was "indicated," which clearly has a less negative connotation than does Defendant's choice of "admitted."   [*Doc. 13-3* at 12].

[14] The Court is not sure to which of § 404.970(b)'s three requirements (*i.e.*, new, material, or chronologically pertinent) Defendant believes this statement pertains, but it certainly does not reduce the temporal relevance of Dr. Moore's evaluation, although that is where it appears in Defendant's response to the motion to remand.

evidence, [and] that failure constitutes substantial legal error necessitating a remand for further proceedings." *Id*. at 1192.

### B.   Plaintiff's Additional Arguments

Plaintiff makes two additional arguments in support of remand: (1) that the ALJ improperly rejected the opinion of Dr. Brown, who examined Plaintiff after the hearing at the ALJ's request; and (2) that the ALJ did not give reasonable explanations for failing to accord the opinions of Plaintiff's treating physicians controlling weight.   Because this Court has determined that the Appeals Council erred by rejecting the report by Dr. Moore and that, therefore, Plaintiff's motion for remand must be granted, those additional decisions will not be addressed here.   The Court finds that it is unnecessary to address these additional claims, as they may be affected by the proceedings on remand.   *See Robinson*, 366 F.3d at 1085 (declining to reach the plaintiff's step five claims because they may be affected by resolution of the case on remand); *Lopez v. Astrue*, 371 F. App'x. 887, 889 and 892 n.6, (10th Cir. March 29, 2010) (unpublished) (remand for failure to articulate the weight given to treating physicians' opinions renders consideration of claims regarding ALJ's reliance on VE testimony unnecessary, since such issues may be affected by treatment of the case on remand) (citing *Robinson*, 366 F.3d at 1085).

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for consideration of the consultative medical examination by Dr. Moore as it relates to the determination of disability.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*** (*Doc. 18*) is **GRANTED** and the Commissioner's decision in this case is **REMANDED** to the Commissioner for further proceedings consistent with

this Memorandum Opinion and Order.   A final order will be entered concurrently with this

Memorandum Opinion and Order.

　　　　IT IS SO ORDERED.


　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　**LOURDES A. MARTÍNEZ**
　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**
　　　　　　　　　　　　　　**Presiding by Consent**